UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

ROGER D. NALLEY,                              )
(Social Security No. XXX-XX-0807),            )
                                              )
                    Plaintiff,                )
                                              )
          v.                                  )        3:07-cv-23-RLY-WGH
                                              )
MICHAEL J. ASTRUE, COMMISSIONER )
OF SOCIAL SECURITY,                           )
                                              )
                    Defendant.                )


**MEMORANDUM  DECISION AND ORDER**


**I.  Statement of the Case**

     Plaintiff, Roger D. Nalley, seeks judicial review of the final decision of the

agency, which found him not disabled and, therefore, not entitled to Disability Insurance

Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d);

20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C.

§ 405(g).

     Plaintiff applied for DIB on October 15, 2003, alleging disability since April 2,

2002.  (R. 104-07).  The agency denied Plaintiff's application both initially and on

reconsideration.  (R. 33-36, 38-40).  Plaintiff appeared and testified at a hearing before

Administrative Law Judge M. Kathleen Gavin ("ALJ") on August 17, 2005.  (R. 430-56).

After an unfavorable decision from ALJ Gavin, the Appeals Council reviewed the

decision and remanded for a second hearing.  (R. 77-79).  Again Plaintiff appeared and testified at a hearing before ALJ Gavin on April 26, 2006.  (R. 457-90).  Plaintiff was represented by an attorney; also testifying was a vocational expert and two medical experts.  (R. 457).  On October 17, 2006, the ALJ issued her opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy.  (R. 17-26).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 7-9).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on February 22, 2007, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 47 years old at the time of the ALJ's decision and had a college education.  (R. 25).  His past relevant work experience was that of a dispatcher, bartender, driver, and sound technician; all of these jobs were light, medium, or heavy semi-skilled jobs.  (R. 25).

### B.  Medical Evidence

Plaintiff was only insured for DIB through June 30, 2005, and the medical evidence relevant to Plaintiff's condition prior to that date is as follows:

### A.  Plaintiff's Back Condition

On May 24, 2002, Plaintiff presented to David Tsai, M.D., a physical medicine

2

and

rehabilitation specialist, of Peninsula Medical Associates with constant intrascapular pain,
numbness of the right upper and lower extremity, muscle spasms, and generalized
weakness of his extremities from a 2001 automobile accident.  (R. 254-57).  Dr. Tsai
noted "[t]he patient walks with an antalgic gait secondary to the numbness on the right
lower extremity.  It causes pain for him to ambulate on his toes."  (R. 256).  Plaintiff
exhibited mild loss to light touch and pinprick along his radial forearm and decreased
discrimination of his entire right leg.  (R. 256).  Dr. Tsai also noted that Plaintiff had poor
balance walking on his heels.  (R. 256).  Dr. Tsai further indicated that MRI studies,
which had been performed on April 9, 2002, revealed a right paracentral disc protrusion
at C5-6 and a smaller left lateral disc protrusion at C6-7.  (R. 255).  The MRI studies also
revealed a small central disc bulge at L5-S1 as well as degenerative disc desiccation at
L1-2 and L5-S1.  (R. 255).  Finally, consistent difficulty with sitting or standing for
prolonged periods are shown throughout Dr. Tsai's records.  (R. 241-57).

A motor and sensory nerve conduction study, dated May 24, 2002, revealed the
presence of C6 nerve root irritation on the right side, right sided peroneal sensory
neuropathy with delayed latency of the sensory nerve, and absent tibial H-reflexes that
suggested chronic bilateral S1 nerve root damage.  (R. 315).

On June 4, 2002, Plaintiff began physical therapy for cervical pain and
radiculopathy.  (R. 376-77).  Plaintiff demonstrated a limp in his gait, a diminished and
painful range of motion in the lumbosacral and cervical spine, reduced grip strength, and

weakness in the right extremities.  (R. 376).  By July 14, 2002, Plaintiff had improvement in all areas except his right upper extremity radicular pain, although it was expected that manual traction would be effective to reduce right upper extremity pain when Plaintiff was able to tolerate it.  (R. 368).

Plaintiff's treating physician, Dr. Tsai, recommended on July 22, 2002, and again on August 22, 2002, that Plaintiff return to work part-time or with restrictions.  (R. 248-49, 250-51).  However, Plaintiff reported that he could not perform the work.  Dr. Tsai referred Plaintiff twice for vocational rehabilitation services, but it does not appear that Plaintiff ever participated in those services.  (R. 241, 246).  However, on October 25, 2002, Dr. Tsai no longer recommended a return to work.  (R. 241).

On September 26, 2002, George J. Martin, Jr., M.D., noted tenderness in the lumbosacral junction in the midline with trigger points.  (R. 244).  Plaintiff also exhibited moderate spasm in the cervical spine.  (R. 244).

Between June 4, 2002, and November 18, 2002, Plaintiff visited Bay Area Physical Therapy 55 times.  (R. 346).  Limited right grip strength was found as well as a limited range of motion throughout the entire spine.  On November 18, 2002, Plaintiff was discharged from physical therapy, noting to have made progress in range of motion, mobility, and strength, although radicular pain continued to be significant.  (R. 346).

On October 1, 2002, a second MRI of the lumbar spine revealed a disc protrusion at L5-S1 on the right, displacing the right S1 nerve root and causing stenosis, as well as

4

narrowing the initial segment of the right neural foramen.  (R. 243).  A degenerative disk space was found at L1-2 with a slight bulge and mild stenosis.  (R. 243).

On January 24, 2003, Plaintiff was evaluated by Lawrence Fink, M.D., a neurosurgeon.  (R. 259-61).  Dr. Fink noted that Plaintiff's prior physical therapy was ineffective.  Examination of Plaintiff's neck revealed well maintained cervical lordosis, no appreciable cervical muscle spasm, negative Spurling's maneuver, and no foraminal compression signs.  (R. 260).  There was, however, mild tenderness over both trapezius margins, and cervical range of motion was limited in lateral bending to either side and rotation to either side.  (R. 260).  Examination of the back revealed loss of lumbar lordosis with flattening of the normal curvature, focal tenderness over the L5 in the midline and the left popliteal fossa, and lumbar range of motion was slightly limited in flexion.  (R. 260).  Plaintiff also displayed sensory deficits in the right upper and left lower extremities.  (R. 260).  However, there was no appreciable lumbar paravertebral muscle spasm and straight leg raising was negative to 90 degrees bilaterally.  (R. 260).  Upon follow-up on January 29, 2003, Dr. Fink noted that he felt Plaintiff's condition was predominantly myofascial.  (R. 258).

On February 3, 2003, Eugenio G. Alcazaren, M.D., diagnosed Plaintiff with persistent neck and back pain, most likely secondary to chronic cervical lumbar strain with no clinical evidence of active cervical or lumbar radiculopathy.  (R. 278-79).

A consultative electrodiagnostic report from Dr. Alcazaren, dated March 13, 2003, indicated that there was a prolonged proximal F-wave response of the right median nerve

as well as mild or low grade right cervical radiculopathy in the C6-7 region.  Plaintiff was scheduled to see a pain management specialist.  (R. 274-75).

On May 14, 2003, "radiographic studies" indicated that Plaintiff suffered from left upper extremity radiculopathy complicated by disc protrusion of C5-6 and C6-7 as well as upper and lower extremity radiculopathy complicated by central disc bulge at L5-S1. (R. 282).  Plaintiff also had abnormal lordosis of the cervical spine.  (R. 282).

On September 17, 2003, Andrew Fine, M.D., from Neurosurgery and Spine Specialists, noted Plaintiff's "radiographic studies" indicated normal cervical lordosis with disc bulge at C5-6 and C6-7 with no neural impingement of the exiting nerve roots or spinal cord.  (R. 299).  Additionally, radiographic studies of the lumbar spine showed normal lordosis, a small disc bulge at the right L5-S1 paracentral location, and no significant neural compression.  (R. 299).  Dr. Fine noted possible S1 nerve root impingement, but opined that Plaintiff's symptoms did not support this.  (R. 219).  Dr. Fine did not explain what "radiographic studies" he was referring to, and no such studies appear in the records.

On October 28, 2004, Steven Chun, M.D., noted a two to three year treatment relationship with Plaintiff.  (R. 407).  Dr. Chun indicated that Plaintiff had significant lumbar radiculitis.  (R. 407).  Plaintiff also had definite herniated discs at C5-6, L3-4, and L4-5.  (R. 407).

Plaintiff was examined on April 4, 2005, by Christopher Wood, M.D.  (R. 340). Plaintiff had trace reflexes in his patellar and ankle jerk.  (R. 340).

6

On June 15, 2005, Plaintiff was evaluated by David Johnson, M.D.  (R. 390-93). Plaintiff reported constant burning, throbbing pain that radiated in his shoulders and stated that he had severe muscle spasms that caused him to fall to the ground.  (R. 390). Dr. Johnson noted that Plaintiff's cervical range of motion was severely decreased and that he suffered from right upper extremity radiculopathy.  (R. 390).  It was also noted that Plaintiff experienced numbness which caused him to have an abnormal gait, and he exhibited a right sided foot drag.  (R. 391).  Plaintiff had a sequential decrease in deep tendon reflexes in the lower extremity from a +2 bilaterally on the initial date of injury, to +1 bilaterally on September 26, 2002, and 0 bilaterally on the examination date.  (R. 391). Dr. Johnson opined that this was consistent with S1 nerve root damage.  (R. 391). Plaintiff also stated that he could not sit for more than 45 minutes, and that prolonged sitting caused him numbness that radiated down his leg onto his outer toes.  Plaintiff estimated that he could stand for only 30 to 45 minutes and, when he walked more than one block, his hips and buttocks hurt.  (R. 390).

Dr. Johnson indicated that he had reviewed interpretations of two MRIs, by Dr. Fink and Dr. Tsai, as well as Electro-diagnostic studies.  Dr. Johnson opined that, because of the radiculopathy in Plaintiff's upper extremities, Plaintiff could lift and carry less than ten pounds, stand and walk at least two hours, sit less than six hours, and perform limited pushing and pulling with his upper and lower extremities.  (R. 392).  Additionally, Dr. Johnson opined that Plaintiff could occasionally crawl and climb ramps and stairs, but could not climb ladders, ropes, or scaffolds, or balance, kneel, crouch, or stoop.  (R. 392).

7

Dr. Johnson further opined that Plaintiff could occasionally reach, handle, finger, and feel, and he was limited in his ability to tolerate temperature extremes, dust, and other pulmonary irritants, vibration, and workplace hazards.  (R. 392-93).  Finally, Dr. Johnson opined that Plaintiff would have to lie down periodically during the workday for 30-45 minutes to relieve the pain and radiculopathy.  (R. 392).

On July 26, 2005, Dr. Wood noted that, based on Plaintiff's trace reflexes and the hypersensitivity in his neck and back, he concurred with Dr. Johnson.  (R. 406).  Then, again on April 19, 2006, Dr. Wood stated that he concurred with the opinion of Dr. Johnson and that the opinion was supported by the objective evidence, especially the nerve conduction study that indicated absent tibial reflexes.  (R. 427).  Dr. Wood also stated that Plaintiff's pinched nerve in his back was more indicative of neuropathy problem than an actual pain problem.  (R. 427).  Dr. Wood stated that Plaintiff's medications would have a sedative effect, and he may have difficulty staying focused on simple repetitive tasks for more than a few hours secondary to a combination of pain, medication, sleep problems, and depression.  (R. 427-28).

On April 6, 2006, Dr. Johnson examined Plaintiff again, ten months after his initial evaluation.  (R. 191).  Dr. Johnson noted that Plaintiff's condition had actually degenerated; since his previous evaluation, Plaintiff had gained some weight, had decreased mobility and agility, and needed a single point cane, both for arising from a seated position and for balance while walking.  (R. 191).  Dr. Johnson also stated that Plaintiff had decreased hand grip and dexterity.  (R. 191).  Dr. Johnson opined that

8

Plaintiff's limitations remained the same as indicated on the June 15, 2005, medical source statement, although his ability to utilize his hands had diminished due to the necessity of the cane.  (R. 191).

**B.  Plaintiff's Heart Condition**

On September 12, 2003, Plaintiff presented to Blake Medical Center with substernal chest pain.  (R. 285, 287-96).  Anthony Pizzo, M.D., diagnosed Plaintiff with acute inferior wall myocardial infarction and three vessel coronary artery disease that required three stent placements in the right coronary artery.  (R. 285-86).  Myoview imaging of Plaintiff's heart was performed on December 1, 2003, and showed evidence of a small previous inferior infarction without ischemia and preserved LV function with regional wall motion.  (R. 262).  Plaintiff participated in a stress test which was stopped secondary to fatigue and back pain.  (R. 263).  However, Plaintiff had no chest pain during the exercise and the overall impression was a negative stress test at diminished workload.  (R. 263).

**C.  Plaintiff's Mental Condition**

On January 20, 2004, Plaintiff underwent a psychological evaluation with Richard Lee Belsham, Ph.D.  (Tr. 332-34).  Dr. Belsham diagnosed Plaintiff with moderate major depressive disorder and post-traumatic stress disorder ("PTSD") that resulted in a moderate to serious impairment in social, occupational, or school functioning.  (R. 333). Dr. Belsham noted that Plaintiff was capable of attending to his personal hygiene needs, but had difficulty with household chores, laundry, and shopping due to his

9

musculoskeletal impairments.  (R. 333).  It was also noted that Plaintiff reported anxiety and panic attacks when driving that interfered with his ability to work.  (R. 333). Plaintiff's Global Assessment of Functioning ("GAF") score at the time was 50.  (R. 333).

On February 18, 2004, Plaintiff was interviewed by the Department of Education, Division of Vocational Rehabilitation.  (R. 335).  However, Plaintiff was only interested in retraining or graduate school and was not interested in pursuing entry-level jobs.  (R. 335).  Consequently, it was noted that he declined services.  (R. 335).

Plaintiff underwent a consultative mental status examination including a Minnesota Multiphasic Personality Inventory ("MMPI") on January 24, 2006, with William Weiss, Ph.D.  (R. 411-20).  Upon examination, Dr. Weiss found that Plaintiff's proverb interpretation was good, abstract thinking was very good, recent memory was good, remote memory was very good, calculations were very good, judgment and insight were very good, information was very good, and serial sevens were adequate.  (R. 415-17).  Plaintiff performed well despite his reports of severe back pain and taking medication.  Dr. Weiss found no deficits in cognitive functioning.  (R. 417).  Dr. Weiss diagnosed Plaintiff with moderate major depressive disorder, panic disorder with agoraphobia, and pain disorder associated with both psychological factors and a general medical condition which resulted in serious impairment in mental functioning.  (R. 419). Dr. Weiss assigned a GAF score of 47 with the highest GAF score in the past year being 50.  (R. 419).  Plaintiff indicated that he would like to get psychological treatment, but he

10

could not afford it.  (R. 419).

**D.  State Agency Opinions**

On March 18, 2004, Timothy D. Foster, Ph.D., a state agency psychologist, reviewed the medical evidence of record and opined that Plaintiff had no restrictions in his activities of daily living, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation.  (R. 211).

On March 22, 2004, Ronald S. Kline, M.D., a state agency physician, reviewed the medical evidence of record and opined that Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and perform unlimited pushing and pulling. (R. 193-200).

**E.  Medical Expert Testimony**

William C. Houser, M.D., a medical expert, testified that Plaintiff's medically determinable impairments were severe, but it was difficult to quantify and verify the severity of Plaintiff's subjective reports of pain.  (R. 472).  Dr. Houser testified that he had reviewed the record and considered Plaintiff's testimony.  (R. 470).  Dr. Houser opined that, based on the evidence, Plaintiff could lift up to 20 pounds occasionally and ten pounds frequently; he could stand and walk for two hours and sit for six hours in an eight-hour day; and he needed an option to sit or stand as needed for comfort.  (R. 473-74).  Additionally, Plaintiff would be significantly limited in his ability to reach,

11

stoop, and bend.  (R. 475).

Elizabeth Kalb, Ph.D., the psychological expert, also testified at Plaintiff's administrative hearing.  (R. 476-81).  Dr. Kalb testified that, based on her review of the records, Plaintiff had major depressive disorder, PTSD, and a somatic disorder.  (R. 477-78).  Dr. Kalb also indicated that Plaintiff's MMPI results suggest that Plaintiff's pain is due to psychological distress.  (R. 480).  Dr. Kalb determined that Plaintiff was able to carry out basic activities of daily living, although he was limited somewhat by his physical problems; he had mild difficulty maintaining social functioning; and he had some difficulty with concentration, persistence, and pace.  (R. 478-80).  Dr. Kalb opined that Plaintiff would not have difficulty performing tasks with one or two steps, but he would have moderate difficulty with complex tasks.  (R. 479-80).  Dr. Kalb testified that, even factoring in Plaintiff's depression, pain, sleep deprivation, and drowsiness from medication, he could still maintain one to two step tasks adequately.  (R. 486).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and

decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court

may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that

of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus,

even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v.

Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

he suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five step test the ALJ is to perform in order to determine whether a claimant is disabled.

*See* 20 C.F.R. § 404.1520.  The ALJ must consider whether the claimant:  (1) is presently

employed; (2) has a severe impairment or combination of impairments; (3) has an

impairment that meets or equals an impairment listed in the regulations as being so severe

as to preclude substantial gainful activity; (4) is unable to perform his past relevant work;

and (5) is unable to perform any other work existing in significant numbers in the national

economy. *Id.*  The burden of proof is on Plaintiff during steps one through four, and only

after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through June 30, 2005,[1] and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 19).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had the following impairments that are classified as severe:  (1) degenerative disc disease of the lumbar spine with radiculopathy; (2) a history of myocardial infarction; (3) depression; (4) anxiety with post traumatic stress disorder symptoms; and (5) somatic psychogenic pain disorder.  (R. 19).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 20).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible.  (R. 21). Consequently, the ALJ concluded that Plaintiff retained the RFC for a limited range of light work that included lifting/carrying 20 pounds occasionally and ten pounds frequently; with the ability to stand for two hours and sit for six hours with a sit/stand option; no stooping, bending, climbing of ropes, ladders, or scaffolds; no overhead work; and is limited to work that involves simple one to two-step tasks.  (R. 21).  The ALJ determined that Plaintiff could not perform his past work.  (R. 25).  The ALJ opined that

---

[1]Because Plaintiff is only insured through June 30, 2005, he must demonstrate that he was disabled before his insured status expired.

14

Plaintiff retained the RFC for a significant range of light work and that Plaintiff could

perform a significant number of jobs in the regional economy.  (R. 25).  The ALJ

concluded by finding that Plaintiff was not under a disability.  (R. 26).

## VI.  Issues

The court has examined Plaintiff's brief and concludes that Plaintiff has essentially

raised five issues.  The court notes an additional issue not raised by Plaintiff in his brief.

The issues are as follows:

(1)      Whether the ALJ violated 20 C.F.R. § 404.1527 (evaluating opinion
         evidence) by giving improper weight to differing medical opinions.

(2)      Whether the ALJ's credibility determination was patently wrong.

(3)      Whether the vocational expert's testimony was accurate.

(4)      Whether Dr. Kalb's testimony took into consideration Plaintiff's
         medications.

(5)      Whether a closed period of disability should have been considered.

(6)      Whether Plaintiff's GAF scores were properly considered.

**Issue 1:  Whether the ALJ violated 20 C.F.R. § 404.1527 (evaluating opinion
         evidence) by giving improper weight to differing medical opinions.**

Plaintiff's first allegation is that the ALJ violated the Social Security regulation

which she must follow to evaluate conflicting medical opinions.  Specifically, Plaintiff

argues that the ALJ did not give enough weight to the opinions of Dr. Wood and Dr.

Johnson and gave too much weight to the opinion of Dr. Houser.  The ALJ's treatment of

this evidence was as follows:

15

As for the opinion evidence, the undersigned gives limited weight to the opinions of Drs. Johnson and Wood. Although these doctors are examining medical sources, and Dr. Wood is a treating source, the objective medical evidence does not support their findings. Dr. Wood first treated the claimant on April 4, 2005, at which time he noted that the claimant had some areas of hypersensitivity in the neck and low back region, but his range of motion was otherwise normal (Exhibit 14F-2). Additionally, it was noted that there were trace reflexes in patellar and ankle jerk. In a letter, dated July 26, 2005, Dr. Wood stated that he concurred with the residual functional capacity as determined by Dr. Johnson on June 15, 2005, based on the foregoing evidence from April 4, 2005, and Dr. Johnson's findings during a single examination, which was partly based on the claimant's subjective complaints. The undersigned notes that Dr. Wood is not a specialist in neurology or diseases of the spine. Additionally, Dr. Wood treated the claimant on June 27, 2005, and no mention was made of any back or neck problems, or difficulties with ambulation. A review of the record shows that Dr. Wood had only three office visits with the claimant, and Dr. Johnson saw the claimant only twice. The undersigned also notes that the findings and opinions of the other treating medical sources are not entirely consistent with the findings of Dr. Johnson: Dr. Fink, a neurologist, stated the claimant's symptoms appeared to be myofascial in nature, and he was not a candidate for surgical intervention. Dr. Alcazaren stated the claimant had persistent neck and back pain, most likely due to cervical sprain, with no clinical evidence of radiculopathy, however an electrodiagnostic study indicated mild cervical radiculopathy. Also, Dr. Johnson's opinion was based in part on the claimant's subjective complaints, which may not be entirely credible, especially given that the record shows the claimant had a significant decrease in exertional abilities between his first visit with Dr. Wood and his first visit with Dr. Johnson, which was only a two month interval. Additionally, there is psychological evidence that the claimant has psychogenic pain.

The undersigned gives substantial weight to Dr. Houser's opinion. It is consistent with the objective evidence in the record, particularly the radiographic studies, and Dr. Houser had the benefit of considering the claimant's mental impairments and psychogenic pain disorder.

(R. 24).

Opinions of a treating physician are generally entitled to controlling weight.

16

*Clifford v. Apfel,* 227 F.3d at 870.  However, an ALJ may reject the opinion of a treating

physician if it is based on a claimant's exaggerated subjective allegations, is internally

inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v.*

*Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527

provides guidance for how the opinions of treating and nontreating sources are to be

evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we
> will evaluate every medical opinion we receive.  Unless we give a treating
> source's opinion controlling weight under paragraph (d)(2) of this section,
> we consider all of the following factors in deciding the weight we give to
> any medical opinion.
>
> (1)  *Examining relationship.*  Generally, we give more weight to the
> opinion of a source who has examined you than to the opinion of a source
> who has not examined you.
>
> (2)  *Treatment relationship.*  Generally, we give more weight to
> opinions from your treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed, longitudinal picture
> of your medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.  If we find that a
> treating source's opinion on the issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with the other
> substantial evidence in your case record, we will give it controlling weight.
> When we do not give the treating source's opinion controlling weight, we
> apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section,
> as well as the factors in paragraphs (d)(3) through (d)(6) of this section in
> determining the weight to give the opinion.  We will always give good
> reasons in our notice of determination or decision for the weight we give
> your treating source's opinion.
>
> (i)  *Length of the treatment relationship and the frequency of*

*examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii)  *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3)  *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4)  *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5)  *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6)  *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict

the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

* * * * *

(f)  *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity.  These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

Based on these considerations outlined in the Code of Federal Regulations as well as relevant Seventh Circuit law, this court must conclude that the ALJ's decision to give substantial weight to the opinions of Dr. Houser and little to no weight to the opinions of Dr. Johnson and Dr. Wood was flawed.

The opinions of Dr. Johnson as adopted by Dr. Wood should have been given

controlling weight.  First, the ALJ rightfully noted that Dr. Wood and Dr. Johnson were

treating and examining sources respectfully.  Second, neither Dr. Johnson nor Dr. Wood's

opinion were internally inconsistent; both doctors found substantial radiculopathy of

Plaintiff's lower extremities upon examination and Dr. Johnson found right upper

extremity radiculopathy, an abnormal gait and right sided foot drag caused by

radiculopathy, and sequential decrease in deep tendon reflexes in the lower extremity

which was consistent with S1 nerve root damage.  (R. 390-91).  And, third, the opinions

of Dr. Wood and Dr. Johnson were consistent with the other medical evidence.

Specifically, Dr. Chun found significant lumbar radiculitis (R. 407), and an

electrodiagnostic report from Dr. Alcazaren indicated radiculopathy.  These findings were

buttressed by:  (1) an April 9, 2001 MRI; (2) a May 24, 2002 nerve conduction study; (3)

an October 1, 2002 MRI; and (4) May 14, 2003 "radiographic studies," all of which

consistently indicated significant nerve problems at the S1 level as well as the C5-6 level.

Even Dr. Fine, who the ALJ claims found evidence that contradicted Dr. Johnson and Dr.

Wood, found sensory deficits in Plaintiff's right upper and left lower extremities.  (R.

260).  The only mention of test results that revealed no radiculopathy was in a letter

written by Dr. Fine.  (R. 299).  However, Dr. Fine references MRI results that appear

nowhere in the record.  In fact, the tests performed closest to the time of Dr. Fine's

opinion were "radiographic studies" conducted in May 2003 which revealed that Plaintiff

had abnormal lordosis as well as radiculopathy caused by disc protrusion at L5-S1 and

C5-6/C6-7 (R. 282) – findings that are diametrically opposed to Dr. Fine's letter.  Dr.

Fine's letter, therefore, finds no support in the record, and it must be disregarded.

Because the opinions of Dr. Wood and Dr. Johnson concerning Plaintiff's radiculopathy are entitled to controlling weight, the ALJ's decision is in error.

The ALJ was also in error by giving such great weight to the opinion of Dr. Houser. This was clearly apparent in examining the criteria set forth in 20 C.F.R. § 404.1527. Dr. Houser was not a treating (or even examining physician), was not a specialist, and there was no length in his treatment relationship whatsoever. Additionally, the only "evidence" presented by Dr. Houser to support his opinion was the letter from Dr. Fine which, as the court noted earlier, finds no support in the record. And, Dr. Houser's opinion concerning Plaintiff's radiculopathy is not supported by the opinions of Dr. Johnson or Dr. Wood, the two MRIs, the two nerve tests, the May 2003 radiographic studies, or the numerous other references to radiculopathy and radicular pain in the record.

Because the ALJ failed to give proper weight to the opinions of Dr. Johnson and Dr. Wood, the ALJ's decision must be **REMANDED.** On remand the ALJ must apply the opinions of Dr. Johnson and Dr. Wood in order to make a proper determination of Plaintiff's RFC.

**Issue 2:  Whether the ALJ's credibility determination was patently wrong.**

After determining that the ALJ should have given controlling weight to the opinions of Dr. Wood and Dr. Johnson, the court notes that the ALJ's credibility determination may also be affected. Plaintiff's activities of daily living were consistent

with his complaints of radiculopathy and radicular pain as described in the opinions of

Dr. Wood and Dr. Johnson.  Plaintiff's condition is exacerbated further by his obesity and

his psychogenic pain syndrome.  On remand, the ALJ must re-examine why Plaintiff's

testimony is not fully credible given the opinions of Dr. Johnson and Dr. Wood, his

activities of daily living, his mental impairments, his obesity, and the effects of his

medications.

**Issue 3:  Whether the vocational expert's testimony was accurate.**

Plaintiff also argues that the vocational expert misidentified the types of jobs in the

regional economy that Plaintiff could perform.  However, because a new hearing

necessitates new findings by a vocational expert, the court need not address this purported

error.

**Issue 4:  Whether Dr. Kalb's testimony took into consideration Plaintiff's
          medications.**

Plaintiff also faults the opinion of Dr. Kalb, the medical expert who testified

concerning Plaintiff's mental impairments.  On remand, the ALJ must take into account

the effects of Plaintiff's medications in making both a credibility determination and a

determination of Plaintiff's RFC.

**Issue 5:  Whether a closed period of disability should have been considered.**

Plaintiff also argues that the ALJ should have considered a closed period of

disability.  It is clear, however, that Plaintiff has consistently suffered from radiculopathy

that has not improved.  Unless new medical evidence in the form of nerve conduction

studies, MRIs, or other objective medical evidence surfaces to show that Plaintiff's radiculopathy has since resolved, there is no need to consider a closed period of disability.

**Issue 6:  Whether Plaintiff's GAF scores were properly considered.**

Finally, Plaintiff claims that the ALJ erred by failing to address Plaintiff's GAF scores.  A low GAF score is not per se disabling.  *Griffith v. Callahan,* 138 F.3d 1150, 1152 (7th Cir. 1998).  Nonetheless, Plaintiff's only two GAF scores were below 50, indicating substantial problems.  Given that this case is to be remanded notwithstanding the ALJ's failure to reference Plaintiff's poor GAF scores, it would be prudent for the ALJ to add a discussion of Plaintiff's GAF scores in any subsequent opinion.

## VII.  Conclusion

The ALJ's opinion written in this case was thoughtful and thorough.  However, this court believes that under the appropriate regulations, the opinions of Dr. Wood and Dr. Johnson are entitled to controlling weight.  The ALJ's credibility determination was also patently wrong.  The final decision of the Commissioner is, therefore, **REMANDED** for further consideration of an appropriate RFC decision and re-evaluation of Plaintiff's claim for benefits in light of those findings.

**SO ORDERED** this 26th day of March 2008**.**

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

23

Electronic Copies to:

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov